# WAIMANALO SUGAR COMPANY *vs*. PACIFIC MAIL STEAMSHIP COMPANY.

## January 3, 1910.

*Admiralty —Evidence—Admissibility of, relating to compensation of other vessels performing similar service:*   In a claim for *quantum meruit* compensation for assistance to a stranded vessel by means of a small steamer, evidence of the remuneration which other vessels received for assisting the same vessel on a *quantum meruit* basis may be received on the question whether the plaintiff is entitled to pay beyond regular rates on the ground of peril to its vessel in the service rendered.

*Same—Same—Admissibility of, pertaining to negotiations for engagement of plaintiff's vessel after previous services had been terminated:* After the termination of services of plaintiff's vessel, plaintiff, on request, made a proposition for an engagement of its vessel for the continuance of its service.   *Held,* that evidence of such proposition was inadmissible, as the information which had so far been acquired as to the character of the service in regard to danger, made a different status from that which existed at the inception of the work.

*Same—Evidence as to matters not alleged in the libel:*   The bill was for emergency service, and contained no allegation of salvage service. Evidence was introduced which tended to support a claim for salvage compensation, had allegations therefor been made.   *Held,* that no question of salvage compensation can be considered.

*Same—Question of compensation for an attempt to assist stranded vessel, which failed:*   Under a bill for *quantum meruit* compensation, in an attempt to go to the assistance of a stranded vessel at the request of the

owner, which failed by reason of the boisterous condition of the sea around the stranded vessel, the owner of the vessel making the attempt is entitled to some compensation.

*Same—Compensation for quantum meruit services in assisting a stranded vessel involving hazard to the assisting vessel:*   Services of a vessel on a *quantum meruit* basis, involving danger to it, are entitled to extra compensation, over regular rates.

*Same—Question of compensation for services whereby owner of stranded vessel is able to carry out its contract for the transportation of passengers and their baggage:*   A vessel assisting a stranded vessel on a *quantum meruit* basis, and performing services whereby the owner of the stranded vessel is enabled to carry out its contract with the passengers for the transportation of themselves and their baggage, is entitled to compensation therefor.

*Evidence—Weight of testimony of witness who remembers and acts on what he remembers, and of witness who does not remember:*   Testimony of a witness who remembers an incident and acts on it, has more weight than that of a witness who does not remember the incident.

*Admiralty—Evidence—Conditions affecting a stranded vessel, as relating to the question of emergency service of an assisting vessel:*   Evidence of conditions affecting a stranded vessel, significant of danger to it, or in the minds of its officers, creating an emergency, to be considered on the question of extraordinary services of a vessel assisting it on a *quantum meruit* basis.

*Same—Marine insurance—Deviation allowed but extra premium to be reached by negotiations in case of loss:*   Marine insurance covering a deviation with extra premium to be found through negotiations in case of loss, not to be considered in estimating compensation where there was a deviation but no loss.

*In Admiralty*:   Libel *in personam* for compensation.

*Henry E. Cooper,* Proctor for Libelant.
*Kinney, McClanahan & Derby,* Proctors for Libellee.

DOLE, J.   The libelant in this case, a corporation, claims four thousand dollars from the libellee, also a corporation, for services rendered the steamship Manchuria by its steam schooner Cummins, of a draft of about 79 tons, and worth about fifteen thousand dollars, the property of the libelant, from August 20th to August 27th, inclusive, the Manchuria during that period being stranded on an exposed shore on the northerly side of Oahu; which assistance it claims interrupted

its own regular business for the time being, and required services which were of an extraordinary character and at great risk to the said steam schooner and of great benefit to the stranded ship, her passengers and cargo; and especially alleges that on the 20th of August it landed passengers and hand baggage from the Manchuria at Waimanalo, making two trips and carrying about 197 passengers; that on the 21st of August it was loading sugar at Waimanalo and, having placed on board about four hundred bags, was, by the agents of the libellee, requested to go to the Manchuria, and immediately responded to such request and went out near the Manchuria but found the sea too rough to make it safe to do any work, and then went on to Honolulu; that on the 22nd of August it took from the Manchuria and carried to Honolulu about eighty tons of passengers' baggage and twenty-six boxes of valuables worth about seventy-five thousand dollars; that on the 23rd of August it carried anchors, cables and other salvage material to the Manchuria and received baggage from her which it transported to Honolulu; that on the 24th it carried supplies to the Restorer, a ship then engaged in salvage operations in connection with the Manchuria; that on the 25th, 26th and 27th it stood ready to respond under a general request from the agents of the Manchuria to operate if wanted.

The answer alleges that no work was performed by the said Cummins for the Manchuria, except on August 20th, 22nd and 23rd, except that she went out to the Manchuria on August 21st at the request of libellee's agents and passed by, and that she did nothing out of her ordinary course of business except on such days; that her work was not of an extraordinary character, nor was she at any time in danger or difficulty thereby; that there was no general request for the Cummins to be ready to be called upon during the last of the days mentioned in the libel; that the Cummins was used merely as a matter of convenience and not as a matter of necessity, there being other vessels available which could have done the same work; and denies that her services were in the nature of salvage services.

The several reserved rulings on objections to questions to witnesses, recorded in the record of proceedings in court on the trial of the case, are disposed of as follows:   Those on pages 19 and 20, 35 and 103, as to the words in the answer, relating to boats in the water, 106, 171 to 178 and following pages, first objection on 249, 299, 306, third objection on 342, 437, 460 and 473, are sustained; those on pages 13, 14, 103, except as to the words in answer relating to boats in the water, 104, 156, 157, 158, 193, 342 first and second objections, 348 and 462, are overruled; motion to strike on page 348, on which a ruling was reserved, is denied, and those on pages 20 and 437 are granted.

The *pro forma* rulings on pages 6, 7 and 13 are affirmed.

In regard to objections on page 249 and following, to admission of vouchers of payment of compensation to the Pioneer and other vessels assisting in the operations for the relief of the Manchuria, as there seemed to be some confusion in the record showing inconsistency in the rulings, I now rule on such objections as follows:

The objections are sustained with the exceptions noted hereafter, on the ground that although some authorities allow such testimony, and I believe it should be allowed under some circumstances, yet in this case, the testimony offered relates to vessels so different in size, capacity and steam power from the Cummins that the pay they have received for time of service or for trips made, fails to furnish the court with any definite standard by which the value of the services of the Cummins may be ascertained.   The instances, however, where such other vessels have been compensated upon a *quantum meruit* basis for the amount of work accomplished, afford some light on the question of the value of the same kind of work performed by the Cummins and the objections to the testimony relating to the pay they have received for such work are overruled.   This finding overrules the objections to questions and answers relating to the services of the steamship Maui.

Upon the ruling reserved on page 405, the ruling above relating to page 249 applies.

Ruling was reserved on objection, page 425, to introduction of blank passenger ticket from San Francisco to Yokohama. The blank ticket in the files as Exhibit H is one from San Francisco to Honolulu. · This is admitted and the objection so far as it applies to this is overruled, subject to withdrawal of request by libelant for its production.

On pages 202 and 436, rulings were reserved on objections to testimony relating to negotiations for the engagement of the Cummins after the termination of her services,—the basis of these proceedings. These objections are allowed, the conditions proposed by the libelant creating a status that was so different from the status of the Cummins from August 20th to 27th, that the evidence offered would be of little assistance, and would be misleading in some respects. Moreover, the situation that confronted the Cummins on August 20th and the following days, differed much from that of August 31st, the date of libelant's proposition for an engagement, when the reef landward of the Manchuria, with its depth of water and nature of coral, was better understood.

The question of the character of the services of the Cummins is the main issue in this case. The contention is made by the libellee that the services of the libelant by means of the Cummins were not in the nature of salvage, but were merely such as should be compensated on the principle of *quantum meruit.* The following facts bear upon this point: (1) testimony that after being informed by the agents of the libellee that the services of the Cummins were no longer required, and before the salving of the Manchuria, the libelant rendered its "bill for emergency services of the S. S. J. A. Cummins,"—and (2) the libel contains no allegation of the performance of salvage work, but that the services were of an extraordinary character and rendered at the great risk, etc., nor does it contain any claim for compensation for services of that nature. If this were a proceeding *in rem* against the hull and cargo of the Manchuria

with the existing allegation as to the nature of the services, the fact that the libelant presented its bill before the salvage of the Manchuria would not probably estop it from its right to salvage compensation for the landing of passengers and cargo, unless the conclusion on the second point should be adverse. In regard to the second point, may the libelant have salvage compensation, in spite of the fact that it has based its claim solely upon emergency services?

"Evidence relative to matters not stated in the pleading, nor fairly within the general allegation, is impertinent and can not be made the foundation of a decree." *Vansciver v. Bryan,* 13 N. J. Eq. 434, 436.

Does the case before the court come within this rule? The libel makes no claim for salvage compensation, but instead, for compensation "of an extraordinary character and rendered at the great risk, hazard and peril to" the Cummins, "and to the great benefit and advantage of said steamship Manchuria, her passengers and cargo," and at the special request of the agents of the libellee. Testimony was introduced by the libelant which would have tended to support a claim for salvage compensation, if foundations for such a claim had been set forth in the libel. The pleadings did not call upon the libellee to meet a claim for salvage, but only one for extraordinary services, made at great risk, hazard and peril to the Cummins, and for loss of time while the "Cummins was held in readiness to promptly respond to any instructions or request" from the agents of the libellee, whereby its own business was interrupted. I am of the opinion that the rule above stated applies as well in admiralty proceedings as in equity, and that this case is well within it, and that the sole issue is what compensation the libelant is entitled to for its services and the delay in its use of the Cummins in its own business, as above stated.

"It is certainly a correct principle that the court cannot decree to any plaintiff, whatever he may prove, more than he claims in his bill. Nothing further is in issue between the parties." *Simms v. Guthrie,* 13 U. S. 18, 24; *Crocket v. Lee,*

20 U. S. 522, 524; *Harrison v. Nixon*, 34 U. S. 483, 503; *Boone v. Chiles*, 35 U. S. 176, 207; *Hobson v. McArthur*, 41 U. S. 180, 194; *Eyre v. Potter*, 56 U. S. 41, 55.

With this point disposed of, the amount to which the libelant is entitled on a basis of *quantum meruit* is to be considered.

The libellee contends, not only that the work of the Cummins is not entitled to salvage compensation, which contention is sustained by the court as above set forth, but also that it was merely ordinary service, and not entitled to compensation above regular rates because of any element of risk to the Cummins in connection therewith.

It appears that the agents of the Cummins,—which was about to start from Honolulu on her regular trip to Waimanalo on August 20th,—on hearing of the stranding of the Manchuria, immediately went out to the Manchuria to render what assistance she could and as those in command of the ship or her agents might request; that she went out to the Manchuria and her services were accepted by those on board for landing passengers with their hand baggage on that day, which was accomplished safely. In doing this she was compelled to proceed to the starboard side of the Manchuria as she lay in shallow water, that being the side toward the shore and the lea side. The weather on that day, according to the evidence of the captain of the Cummins was boisterous. This is supported by the evidence of Captain Saunders of the Manchuria, who refers in his two letters of August 26th (Libelant's Exhibit 7) to the heavy seas on that day and to the "twisting jerks" of the ship and the damages to the interior fixtures thereby caused, and says "last night and today so far is the roughest we have had since the second day on the reef,"—which was August 21st; and in his deposition (p. 10) he says, "I don't think there was any difference" between the sea, wind and surf on the 21st and on the forenoon of the 20th. See, also, Klebahn's testimony, Tr. p. 357. The defense has attempted to show that the operation was an ordinary one attended with no danger. The master of the Cummins, without knowing of the character of

the sea bottom on the shore side of the Manchuria, and without waiting to inform himself by taking soundings, which would have caused considerable delay, proceeded at once to a position at the gangway of the Manchuria to tie up and take off the passengers.

I consider that this operation was, under the circumstances, attended with enough uncertainty to include possible damage to the Cummins, inasmuch as the reef on which the breakers were observable was but several hundred feet,—exactly how many cannot be ascertained from the testimony,—shoreward of the Manchuria, and that the character of this space being unknown to the master of the Cummins, she was liable, in her maneuvers in going to the gangway of the Manchuria and in leaving, to encounter projecting coral growths which might have been of great injury to her. On leaving the Manchuria she went around her bows, which was the nearest part of the hull to the shore, and at one time, either that day or on subsequent days, she turned around and went out around her stern, these maneuvers requiring considerable space and bringing her much nearer to the shore than the locality where the Manchuria was lying. The danger to the Cummins is emphasized by the fact that the dredger Pacific, while engaged later in some service to the Manchuria near her bows, allowed her stern to swing around and bumped her rudder post (Klebahn, Tr. p. 359); and also by the fact that the tug Eleu, while turning around on the shore side of the Manchuria, went aground (Haglund, Tr. p. 231). Moreover the testimony relating to the services of the steamship Maui and her compensation therefor, and admitted as above stated, on the question whether the services of the Cummins were ordinary or extraordinary, is eloquent as to the unusual nature of the work in the minds of the agents of the libellee. Counsel for claimant, in his brief, attacks the theory of danger to the Cummins, but the testimony favoring it is greatly preponderating.

Was the landing of the passengers a service necessary to the safety of the ship? This is answered in the affirmative by the

testimony of Mr. Klebahn, one of the members of the firm of
H. Hackfeld & Co., Ltd., agents of the Manchuria, who said it
was the best thing in his opinion to get all the passengers on
board the ship out of the way and have them gotten on terra
firma as quickly as possible so as not to interfere with the work;
as long as they are on board they have to be looked after and
it takes more or less the whole crew to do it (Tr. p. 335).

The services of the Cummins on the next day, when at the
request of the agents of the Manchuria that she should pro-
ceed to her assistance, she gave up her work of loading cargo at
Waimanalo in her own business and went out near to the Man-
churia, and finding the weather such that it was not safe to go
to her, proceeded on to Honolulu, was work to be paid for, in
that she made an attempt at the request of the ship and, with-
out fault, was unable to accomplish anything. That the Cum-
mins was justified in giving up her plan to go to the Manchuria
on the 21st on account of the heavy weather, seems demon-
strated by Captain Searle's testimony and Captain Saunders's
letters above referred to. Whether on finding herself unable
to render any assistance on that day, she should have returned
to Waimanalo and finished taking in cargo in her regular busi-
ness instead of going on to Honolulu with the small amount
of cargo she had already taken, is a question which would
slightly affect her claim for compensation for such services. I
find nothing in the evidence which gives any satisfactory reason
why she should not have finished loading her own cargo. At
any rate she is entitled to some consideration for her attempt.

Her services on the 22nd consisted in the removal of some
eighty tons of baggage and twenty-six boxes of valuables from
the Manchuria and conveying them to Honolulu. The opera-
tions on the shore side of the Manchuria were hazardous, as
already noted, and were not in the nature of ordinary opera-
tions. The boxes of valuables of an agreed value of seventy-
five thousand dollars, were mainly watch cases and watch ma-
chinery,—freight of great value and liable to be injured by salt
water. It is in evidence that the cargo of the Manchuria suf-

fered material injury from the stranding, a large quantity of it being damaged by salt water which leaked into the vessel, and although much of the cargo was retained on board for a while to keep the ship down and steady, yet it all had to be removed eventually for the sake of rendering her lighter and more buoyant in order to facilitate the work of removing her from the reef.

The work performed on the 23rd was the transportation of anchors, chains and other salvage equipment to the Manchuria, and a further removal of passengers' baggage to Honolulu.

Counsel for the libellee contends that there can be no salvage of baggage, because its removal "in no way enures to the benefit of the passengers"; and cites 24 Ency. of Law, 1189, and *Kennedy on Civil Salvage,* 178. Both of these authorities refer to wearing apparel of passengers as privileged, but this includes only "apparel and such other articles as the passengers wear, with the usual change for the voyage, and as they actually take with them for use, which are in that sense attached to their persons; not trunks delivered into the exclusive charge of the ship, which are neither in use nor in the passengers' possession during the voyage." 4 *Cf. Boulay-Paty, Cour de Droit Commercial,* p. 562; *Kennedy on Civil Salvage,* 52-53. Libelant's brief raises a further point in this connection, which is that the landing of the passengers enabled the Manchuria to carry out her contract of transporting the passengers who were en route, to Honolulu and ports beyond. If there is anything in this contention it applies as well to the question of the landing of the passengers' baggage. It appears by the authorities that a person, not the owner of property salved, may be charged salvage compensation, if he is benefited by the salvage thereof.

" I think it [the liability to the payment of salvage] exists in cases where the defendant has an interest in the property saved, which interest has been saved by the fact that the property is brought into a position of security." *Five Steel Barges,* 15 L. R. (P. D .)142, 146; *Abbott's Law of Merchant Ships & Seamen,* 999; *Kennedy's Civil Salvage,* 179.

Unquestionably the safe landing of the passengers and their baggage was a service which was directly in aid of the performance by the libellee of the contract of transportation of the passengers with their baggage.   This discussion, with the authorities, would, it seems to me, apply as well to the question of earning *quantum meruit* compensation, inasmuch as it was a service of value to the libellee, by which it was enabled to carry out its contract with the passengers.

· On the 24th the Cummins discharged the load brought to Honolulu on the previous day and took in supplies for the cable ship Restorer, then engaged in operations for the salvage of the Manchuria.   Such supplies were carried to the locality of such operations and delivered to a launch to be taken to the Restorer.   Whitney says this was done at the request of McClanahan, who denies it.   The ruling *infra* on a similar situation applies here.

It appears from Captain Searle's testimony that on Monday, the 27th, or Tuesday, the 28th, the Cummins carried supplies and washing from Honolulu to the scene of the wreck and delivered them to a launch to be taken to the Manchuria.

The claim that the Cummins was held for whatever service the libellee might require until some time on Monday, the 27th, thereby interrupting its own regular business with ports on the Koolau side of Oahu, is contested by the defense.   Mr. Whitney, agent for the Cummins, testified (Tr. pp. 144-145) that upon asking Mr. McClanahan, August 21st, whether he had any further use for the Cummins, was told that they would employ her until further orders, and that on Monday, the 27th, he was informed by the libellee's agents "that the services of the Cummins were no longer required in that work, but that they would like me to make a bid for the transportation of cargo to Honolulu" (Tr. p. 150).   Mr. McClanahan admits that he so informed Mr. Whitney upon being asked by him whether the use of the Cummins would be further required, but that there was no general engagement of the Cummins, the understanding being solely, that they were to be notified when her services

would not be available, and that on the 21st, when the Cummins attempted to go to the Manchuria but failed, and on the 22nd and 23rd, when she went alongside of the Manchuria, she acted at the special request of the agents of the libellee. These three occasions of the action of the Cummins on request do not bear upon the question of an engagement, as in any case special instructions as to the movements of the Cummins would be necessary.

The testimony both of Whitney and McClanahan that on the 27th the latter informed the former that the services of the Cummins would be no longer required, tends to support Whitney's testimony of an engagement of the Cummins until further orders. Mr. Whitney was so impressed by Mr. McClanahan's language that such an engagement was definitely made, that he instructed the master of the Cummins to that effect, and both he and Captain Searle appear to have acted on such an understanding, as during the period from the 24th to the 27th of August, inclusive, the Cummins was not sent on any of her accustomed trips to ports other than Waimanalo; although she did some of her own business with the latter port during that period. The testimony of a witness who definitely remembers an incident and acts on it, is generally more reliable than the testimony of one who does not remember it. I am of the opinion that an engagement of the Cummins existed during the period mentioned. It does not, however, appear from the evidence that the interruption of the Cummins's visits to other ports, caused any injury to the business of the libelant with such ports, or to its customers.

In considering this case the condition of the Manchuria lying on the reef near to an exposed coast has much weight. The fact that she was finally saved does not affect the questions involved. It is obvious that she was in a position of great danger. Captain Saunders's two letters of August 26th (supra) are eloquent as to the dangerous position she was in; her movement on the reef on account of the heavy seas being disastrous to her internal arrangements, some of the saddles under the

boilers being broken and the boilers "working badly" on such saddles, and the rivets in the ballast tanks leaking. There was always the possible danger to the ship and to its cargo and passengers from the possibility of a heavy swell coming in from some distant storm, a common experience in the Hawaiian Islands, and especially on their northerly shores.     Captain Olsen, on being strongly pressed by counsel to say that there was no danger to the passengers, would only go as far as to say that there was no danger to them "just at that particular time," implying that danger might arise.

The question of danger to the Manchuria, her passengers or cargo, may have little to do with the question of the amount of compensation due the libelant, inasmuch as the latter is entitled to compensation for its services whether such danger existed or not, but the testimony bearing thereon is relevant to the main issue so far as it throws light on the question of the character of the services of the Cummins and the element of peril in its operations, and also, in so far as it throws any light upon the conditions under which such operations were performed, as showing the nature of the emergency, if any, that existed, and the pressure on the Cummins because of such emergency, or because of the impressions of the officers or agents of the Manchuria that an emergency existed, to act promptly and take chances.

The Cummins was insured under a policy which provided that a deviation is covered by the policy at a premium to be agreed upon afterward according to equity. I find that her services in going to the Manchuria were deviations from the "coasting navigation," permitted by her policy. Although such deviations were covered by the policy, the premium to be paid in case of loss being a matter of negotiation, presents a question of discount of the amount of insurance money, that can not be solved, even approximately by the court, and which might, should the occasion arise, be settled on a basis that would greatly reduce such amount.     But, as the occasion has not arisen, the contingency cannot be considered in estimating

the libelant's compensation. *Blagg v. Bicknell,* 3 Fed. Cas. (No. 1476) 555.

The steamship Maui went over to the scene of the wreck as a volunteer on August 20th, and received on board from 236 to 240 of the steerage passengers of the Manchuria, who were brought to the Maui in her own boats and those of the Manchuria, with some possible assistance from the boats of the steamship Kinau. The Maui did also about two hours' pulling on the Manchuria. She was allowed for her services that day $1,500, we must presume on a *quantum meruit* basis, as the bill was presented within a few days and so far as appears without relation to the success of the salvage operations. The bill was stated by the witness Gedge to be for the carrying of passengers only. Taking this to be correct, she received not less than six dollars for each passenger carried to Honolulu. Her service in receiving the passengers from small boats did not compare with that of the Cummins in its work of receiving the 197 passengers from the gangway of the Manchuria in the element of risk, as is made sufficiently clear above. In fact the risk, if any, to the Maui may be said to have been so small as to have been of no consequence. In view of the above estimate of the libellee as to the compensation earned by the Maui, and of the risks encountered by the Cummins, I find that the libelant is entitled to ten dollars for each passenger landed by its vessel, or $1,970.00 for the 197 passengers.

On Wednesday, the 22nd, and on Thursday, the 23rd, the Cummins made round trips, conveying on the first day from the Manchuria to Honolulu, valuables, such as watch cases and works, and coin, mostly the former, of the value of $75,000, and about eighty tons of passengers' baggage, and on the second day conveying to the Manchuria wrecking gear, and taking from her to Honolulu about eighty tons of passengers' baggage.

In considering the transportation of the valuables, I take into consideration the established rate for carrying such freight in the coasting service of the Hawaiian Islands, which is one-

fourth of one per cent. of the value. This comes to $187.50, and in view of the unusual and perilous nature of the work of the Cummins I allow twice that sum, or $375. In regard to the baggage, the regular rate of freight in quantity between Waimanalo and Honolulu is two dollars a ton. Allowing four dollars a ton, for the same reason, the compensation allowed for the 160 tons is $640.00. In regard to the wrecking gear which was testified to in such a general way, except as to four or five anchors weighing three tons each, it is difficult to estimate the value of this service. I allow for the four anchors, $48, which is double the regular rate for such pieces of freight, and $50 for the rest of the wrecking gear. The service of Tuesday, August 21st, in which nothing was accomplished, may perhaps be fairly estimated at $50, and the service on Friday, the 24th, in carrying supplies for the Restorer, and that of Monday, the 27th, when supplies and washing were taken over for the Manchuria, may be allowed to aggregate $50. The findings then may be scheduled as follows:

| | |
|---|---:|
| Landing passengers | $1,970.00 |
| Conveying valuables worth $75,000 to Honolulu | 375.00 |
| Conveying 160 tons of passengers' baggage | 640.00 |
| Carrying wrecking gear to Manchuria | 98.00 |
| Attempt of August 21st to go to Manchuria | 50.00 |
| Carrying supplies for Restorer and Manchuria | 50.00 |
| Total | $3,183.00 |

Decree will be signed for this amount with interest from the 12th day of October, 1906, with costs.

*Modified on Appeal*: See *Pacific Mail S. S. Co. vs. Waimanalo Sugar Co.*, 181 Fed., 927.